Brown v. McIntosh.

---

STEWART BROWN v. ROBERT McINTOSH.

Money paid usuriously may be recovered. The rule is not changed by the present usury act.

---

The plaintiff sued to recover three distinct claims. One was for money paid usuriously upon various loans by plaintiff to the defendant. The amount so paid was $46.75. At the trial at the Monmouth Circuit, the court charged that this amount so paid could be recovered, to which charge an exception was taken.

The case is certified to this court for its advisory opinion, whether the bonus or illegal interest claimed in the plaintiff's declaration, is a legal charge against the defendant.

Argued at June Term, 1876, before BEASLEY, CHIEF JUSTICE, and Justices SCUDDER, DIXON and REED.

For the plaintiff, *George C. Beekman.*

For the defendant, *Chilion Robbins.*

The opinion of the court was delivered by

REED, J. This claim for the recovery of money usuriously paid, on first impression seems to encounter two fundamental maxims of the common law.

As it was apparently paid voluntarily, the rule *volenti non fit injuria* would appear to forbid its recovery.

As it was paid in contravention of the provision of a statute, the maxim *in pari delicto potior est conditio defendentis,* would appear to place another obstacle in the way of any remedy for a party to the payment.

Indeed, it is reported that Treby, C. J., in the year 1693, on these two maxims, ruled that for money usuriously paid, *indebitatus assumpsit* would not lie. *Tomkins* v. *Bernet,* 1 *Salk.* 22.

In the year 1734, however, Lord Chancellor Talbot, in the case of Bosanquet *v.* Dashwood, decreed that the receiver of money paid usuriously should, in equity, account. *Cas. T. Talbot* 38..

This became the settled doctrine in equity. 1 *Fonbl. Eq.* 235 ; 1 *Story's Eq. Jur.,* § 302.

As these courts of equity recognized the doctrine that a person *particeps criminis* could ask for no relief, it is apparent that they must have engrafted upon the rule an exception peculiar to equity, or else there was a manifest incongruity between the rulings of the courts of equity and common law.

While Lord Chancellor Talbot noticed the case of Tomkins *v.* Bernet as an authority at law, he did not attempt to show that the same person could be *in pari delicto* at law, and not in equity, but he announced generally the doctrine that in any case of oppression, the party oppressed was not *particeps criminis,* and he placed the payer of usurious interest in that class.

And the grounds upon which courts of equity have ever

since afforded relief to parties who have paid money or pledged goods, against the provisions of the statute of usury, is, that the parties are not *in pari delicto. Story's Eq. Jur.*, § 302.

This conflict between the doctrines announced by the respective courts in the two earlier cases, disappeared through the abandonment, by the common law courts, of the doctrine in Bernet *v.* Tomkins, and their general adoption of the principle enunciated by Lord Chancellor Talbot.

The common law courts distinguished a class of statutes, a payment made in violation of the provisions of which did not fall within the operation of the rule of *in pari delicto*.

The distinction is well stated in note F to the case of *Jones* v. *Barkley, Doug.* 697, *a.* " Where the law that creates the illegality in the transaction, was designed for the coercion of one party and the protection of the other, or where one party is the principal offender and the other only criminal, from a constrained acquiescence in such illegal conduct in these cases, there is no parity of *delictum* at all between the parties."

This rule formulates the doctrine resulting from the rulings in a variety of cases, many of them to be found in the notes to *Merryweather* v. *Nixan*, 2 *Smith's Lead. Cas.* 528.

Thus money paid as premium to a lottery-office keeper, against the provisions of the statute 14 *Geo. III., ch.* 76, was held recoverable. " Here," said Blackstone, Justice, (on the part of the insured,) " the contract on which he paid his money is not criminal, but merely void." *Jaques* v. *Golightly* 2 *W. Black.* 1074. So, also, money paid by a bankrupt to a creditor, in excess of the creditor's share of the estate, for the purpose of inducing the creditor to sign the certificate, in violation of the statute 5 *Geo. II., ch.* 24, § 17, was held recoverable. *Smith* v. *Bromley, Doug.* 695. So, also, money paid by a defendant to an informer, to compound a penalty against the terms of the statute of 18 *Eliz., ch.* 5, § 4, was held recoverable. *Williams* v. *Hedley*, 8 *East* 378.

In each of these cases the prohibitions and penalties of the statute were levelled at the party who received the money, and the court recognized a distinction between his guilt and

that of the party intended to be protected by the statutes, and so held them not *in pari delicto.*

In the case of *Browning* v. *Morris, Cowp.* 790, Lord Mansfield instanced some of this class of statutes and among them named the statute of usury. " These statutes," he said, " were made to protect needy and necessitous persons from the oppression of usurers and monied men who are eager to take advantage of the distress of others, whilst they, on the other hand, from the pressure of their distress, are ready to come into any terms, and with their eyes open not only break the law, but complete their ruin."

The same great jurist had before, in a case tried before him in the year 1760, criticised the case of Tomkins *v.* Bernet, and concluded that the reporter, Salkeld, gave false reasons for supporting the judgment therein. See Buller's note of *Smith* v. *Bromley, Doug.* 695.

It is true that the cases in which Lord Mansfield expressed these views, were not cases in which the recovery of money usuriously paid was sought, but they were actions for the recovery of money paid in violation of statutes analogous to the usury acts.

Indeed, they were so analogous that an admission of the doctrine of Treby, C. J., defeated the recovery of the money sued for in the cases he was then considering.

The cases were not distinguishable, and he was compelled either to recognize or repudiate the doctrine of Tompkins *v.* Bernet, and he did the latter. He seems to have completely exploded the ruling in that case. Lord Ellenborough, in 1807, in Williams *v.* Hedley, spoke of the constant practice to recover back the excess beyond legal interest. This seems to have since been the undisputed rule in England, and it is incorporated in the text and notes of all their books of authority, both in law and equity. 2 *Saunders' Plead. and Ev.* 389 ; 2 *Chitty on Con.* 939 ; *notes to Fonbl. Eq.* 235.

It is observable that the reasoning which relieves the payer of the character of *particeps criminis,* also takes his payment,

out of the operation of the rule relative to voluntary payments.

No payment obtained through oppression or undue advantage is voluntary, and the law presumes every payment made to a person who is by statute forbidden to receive it, where the statute is for the protection of the payer, as made through oppression and undue advantage.

Thus, then, stood the law in England as to money usuriously paid so long as there were statutes under which money could be paid usuriously, and the courts of this country have generally followed the reasoning and result in the English courts. *Schroeppel* v. *Corning*, 5 *Denio* 236; *Philanthropic Building Asso.* v. *McKnight*, 35 *Penn.* 470; *Willie* v. *Green*, 2 *N. Hamp.* 333; *Inhabitants of Worcester* v. *Eaton*, 11 *Mass.* 368; *The State Bank* v. *Ensminger*, 7 *Blackf.* 105; *Fay* v. *Lovejoy et al.*, 20 *Wis.* 403; *Bond* v. *Jones*, 8 *Smedes & Marsh.* 368; 2 *Greenl. Ev.*, § 121.

The defendants, however, insist that the right of recovery ceased in this state upon the enactment of the first section of the supplement of 1864, now the second section of the revised statute. It is urged that the statute of Anne and the statute of this state, which, previous to 1864, was substantially a copy of the English act, made all notes, agreements, &c., tainted with usury, void; that the present act contains no similar provisions. I am unable to understand how this affects this case. Within the meaning of the rule we have been considering, any payment made in contravention of the provisions of a statute is illegal. When the courts have used the term void, they have meant that and no more.

The first section of the present act forbids the taking of more than seven per cent. Any agreement to pay and any payment was expressly proscribed and was illegal. 2 *Chitty on Con.*

In *Crosby* v. *Bennett*, 7 *Metc.* 17, it was held that a person who paid more than six per cent. could not recover back the excess in an action for money had and received, but it was so held, upon the ground that the payment was not illegal. The

court distinguishes that case from *Willie* v. *Green*, 2 *N. Hamp.* 333, where it was held a recovery could be had, " because the statute of New Hampshire prohibited the taking of more than six *per cent.*, and thereby made it illegal."

Under our statute, the agreement to pay an excess of the legal interest is void, because forbidden by the act, and any payment of such excess stands as it always stood.

The supplement of 1864 only affects the securities taken for principal, interest and usury, and saves the securities to the value of the principal.

It is again said that the present statute provides a method of redress for a party who has agreed to pay or paid an excess of interest ; that his remedy is to interpose it as a defence to an action to enforce the contract upon which the money has been reserved or paid.

It is urged that this, by implication, defeats the common law remedy for money once paid.

Now it is apparent that the general character of the usury act remains unaltered.

It is clear that the lender is still forbidden to receive usury.

It is equally clear that the design of the act is now, as ever, to protect the borrowers. All the reasons for allowing this action still subsist. On common law principles the remedy still remains, unless taken away by the second section of the act. *Wheaton* v. *Hibbard*, 20 *Johns.* 290. It does not do this by express words. Nor is there any implication that the action is by legislative intent abolished. The design of the legislature was to modify the severity of the punishment for violations of the act. It abolished the penal action. It reduced the forfeiture imposed upon the unpaid lender from an entire loss to a loss of all interest, legal and illegal.

It provided the lender with a remedy for the recovery of the principal loaned, where before he had none. It gave him an action upon the contract, which before had been void, and a right of recovery to the amount that it represented money actually loaned.

As the costs of suit would, in some instances, equal the

legal interest and usury, and so defeat the object of the act, it was provided that no costs should be recovered.

The concluding clause in relation to the deduction of illegal interest previously paid, was introduced to make clear the legislative intent that the lender should, in such action, recover no more than he had in reality advanced.

It was to mark clearly that he should gain no advantage by having previously received usury.

The design was not to change the character of the payment of usury, but to afford the lender a remedy for his principal, and to regulate that remedy so as to clearly define the limits of his recovery.

There was no design to cut off the right to sue for money paid usuriously, and I am convinced that money so paid, under our act may be recovered.